IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DAVID SLIGHT,<br><br>                        Petitioner,<br><br>vs.<br><br>INGRID NOONKESTER f/k/a<br>INGRID VAIVADAITE,<br><br>                     Respondent. | CV 13-158-BLG-SPW<br><br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>and ORDER** |

This matter came before the Court for an evidentiary hearing on Petitioner

David Slight's ("David") Verified Petition for Return of Child and Petition for

Immediate Issuance of Show Cause Order to Respondent ("Petition") on January

21, 2014. This Petition was filed pursuant to The Convention on the Civil Aspects

of International Child Abduction, done at The Hague on October 25, 1980, T.I.A.S.

No. 11,670 at 1, 2254 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10494 (1986)

("Hague Convention" or "Convention"). At the hearing, Slight was represented by

Shane Coleman and Jamie Iguchi of Holland & Hart, LLP. Respondent Ingrid

Noonkester ("Ingrid") was represented by William Gilbert of High Plains Law,

PLLC. At the hearing, both parties presented evidence and argument to the Court.

From the evidence received at the hearing, the Court enters the following:

# FINDINGS OF FACT

*Background*

1. David is an Irish citizen who has resided in Dublin all of his life. Ingrid is a Lithuanian citizen who at some point moved to Dublin. In June 2004, David and Ingrid met and began a relationship. Although they never married, David and Ingrid lived together until their separation in January of 2010.

2. In November of 2005, David and Ingrid's son, L.S., was born. (Ex. 501).

3. After their separation, David and Ingrid shared responsibilities as to L.S.' upbringing. Ingrid exercised custody the majority of the time. At the time, Ingrid worked three jobs, and David watched over L.S. when Ingrid was working. In addition, David would periodically have L.S. over for sleepovers and would occasionally drop off and pick up L.S. at school.

4. At some point in May 2012, the parties arranged for Ingrid to leave L.S. in David's custody on May 25, 2012. However, Ingrid never arrived at the designated location with L.S. Instead, on May 25, 2012, Ingrid and L.S. boarded a plane and flew to the United States, with their ultimate destination being Brady, Montana. The purpose of traveling to Montana was to move in with Alan Noonkester ("Alan"). Alan and Ingrid decided to live together after meeting on the internet.

5. Ingrid only decided to move L.S. out of Ireland after consulting materials provided by Treoir, which is an Irish organization that supplies information to unmarried parents. (Ex. 517). The materials informed Ingrid that under Irish law, the mother is the sole guardian of a child born unto unmarried parents. Accordingly, unless the father petitions a court for joint guardianship, the mother can remove the child from Ireland without the father's permission.

6. David had no knowledge of Ingrid's plans, nor did he ever consent to L.S.' departure from Ireland. In addition, at no time prior to L.S.' departure did David ever apply to an Irish court for guardianship, custody, or access.

*David's attempts to bring L.S. back to Ireland*

7. In the morning of May 25, 2012, after waiting in vain for Ingrid's arrival, David sent Ingrid a text message. Ingrid did not respond, so David sent another text that afternoon. That evening, Ingrid responded and falsely told Slight that she was in Lithuania and had moved in with her mother. Ingrid acknowledges that she lied to David, but explains that she was afraid of David's reaction and only lied to buy some time.

8. On May 26, 2012, David informed the Irish police that Ingrid had removed L.S. from Ireland without his permission. (Ex. F). About eight

weeks later, in late July 2012, the police informed David that Ingrid had not gone to Lithuania, but rather gone to Montana. The police also gave David the street address where Ingrid and L.S. were living.

9. Although not exactly clear when, at some point in 2012, David filed a petition for L.S.' return with the Irish Government. David claims that this petition was denied due to the fact that David was not a guardian of L.S. at the time of the abduction.

10. On June 5, 2012, David applied to the Dublin Metropolitan District Court ("Dublin Court") for both sole custody of L.S. and to be named his guardian. (Exs. C-3 and C-4). While it is unclear whether Ingrid was served with these documents, she did know about the pending action. Ingrid never made a formal appearance before the Dublin Court, and the only action she took was writing a letter to the Dublin Court explaining her circumstances.

11. On September 11, 2012, the Dublin Court appointed David as both joint custodian and joint guardian of L.S. (Exs. C-1 and C-2). In the order appointing David joint custodian, the Court stated that:

> Provided that the party to whom custody/access of the said child(ren) is hereby given shall not remove the said child(ren) from the jurisdiction of this Court without having first obtained in writing of the other party or the leave of this Court or of any other Court of competent jurisdiction.

(Ex. C-2 at 2).

12. Ingrid never saw the Dublin Court's orders until she was served with the Petition on December 31, 2013. However, she likely knew that the Dublin Court had issued such orders.

13. On November 9, 2012, David completed an Authorization to Release Case Information to allow the U.S. Department of State to discuss his case with prospective attorneys in the U.S. (Ex. H).

14. On April 15, 2013, David filed an application for access under the Hague Convention with the Ireland Department of Justice and Equality. (Ex. D). In that application, David authorized the Central Authority for the United States of America to represent him and act on his behalf. *Id.* at 6. On June 10, 2013, the Ireland Department of Justice and Equality forwarded David's application to the U.S. Department of State. (Ex. G). In the accompanying letter, the Irish Department representative noted that David previously applied for David's return, which was denied as he was not a guardian at the time of removal. *Id.* at 1.

15. On September 13, 2013, the U.S. Department of State arranged a phone call between David and his present counsel. This was the first contact David had with an American attorney.

*L.S.' Adjustment to the United States*

16. After their arrival in the United States, Ingrid and L.S. moved to Brady,
    Montana, to move in with Alan.  Ingrid and Alan married in August of
    2012.

17. While in Brady, L.S. attended school in the Dutton/Brady School
    District from August 2012 until February 2013.

18. After his arrival in Montana, L.S. developed a close relationship with
    Alan.  L.S. and Alan have good relationship, with the two participating in
    typical father-son activities.  L.S. has also developed close and
    meaningful relationships with Alan's two children from a prior
    relationship.  In particular, L.S. is close with his step brother, Liam, who
    is two years older.  Although Liam lives primarily with his mother in Fort
    Benton, Liam visits over the summer and on holidays.  L.S. also has
    developed close ties with his step-grandparents.  His step-grandmother,
    Laurie Campbell, lives in Brady and made a point to introduce L.S. to
    other children in his neighborhood.  L.S. continues to speak regularly
    with Ms. Campbell.

19. In February 2013, Alan, Ingrid, and L.S. moved to Worden, Montana, so
    that Alan could take a job at the Signal Peak coal mine.  In the fall of

2013, L.S. enrolled at the Huntley Project Elementary School. L.S. has done well at school and has obtained good grades. (Ex. 506). He is rightfully proud of the fact that despite being in second grade, he reads eighth grade-level chapter books.

20. After his move to Worden, L.S. developed more close ties to family members. He became close with his step-grandfather Grant Noonkester, who lives in Shepherd. L.S. also has a close friendship with his cousin, Valentine. Valentine lives in nearby Huntley, and he and L.S. play multiple times a week.

21. Ingrid and L.S. do not face an immediate threat of deportation. Ingrid and Alan visited the U.S. Citizenship and Immigration Services Field Office in Helena, where they receive assurances that Ingrid is in the country legally. She does face several restrictions, such as being unable to work and if she leaves the U.S., she will not be allowed to return. Therefore, Ingrid does not hold employment and is a homemaker. Ingrid is in the process of applying for status as a permanent resident for herself and L.S.

22. L.S. and David have had regular contact. Ingrid allows them to talk on the phone Saturday and Sunday mornings (Mountain time) while L.S. is in school and more frequently over the holidays. David has also sent

money for L.S. to spend as he wants; however, he has prohibited Ingrid from using this money as child support.

23. The Court met with L.S. in chambers and on the record. L.S. is bright, articulate, and seems mature for an eight year old. L.S. expressed his desire to remain in Montana. L.S. stated that he wants to maintain a relationship with David, including possible visits to Ireland. However, L.S. is comfortable in Worden and wishes to remain with Ingrid and Alan.

*Procedural History*

24. David filed the Petition and commenced the instant action on December 27, 2013. This Court set an evidentiary hearing for January 21, 2014.

25. On January 21, 2014, prior to the start of the hearing, Ingrid filed a Rule 12(b)(6) Motion to Dismiss, arguing that under Irish law, L.S.' removal could not have been unlawful as David did not have any custodial rights. David conceded that Ingrid did not wrongfully remove L.S. from Ireland, but responded that Ingrid wrongfully retained L.S. after the Dublin Court named David as a joint custodian and joint guardian. The Court took the motion under advisement.

26. To the extent that any of the foregoing findings are deemed to be conclusions of law, they shall be so treated.

# CONCLUSIONS OF LAW

## I.     Jurisdiction, Venue, and Service

27. This Court has jurisdiction over the subject matter of this action.  42

U.S.C. § 11603(a).

28. This Court has personal jurisdiction over Ingrid, as Ingrid resides in

Montana and has not objected to personal jurisdiction.

29. Venue is proper in the District of Montana and in the Billings Division

because Ingrid resides in Yellowstone County and has not objected to

venue.

30. Ingrid received proper notice of this hearing.  42 U.S.C. § 11603(c).

David served Ingrid with copies of the Summons and Petition on

December 31, 2013 (Doc. #4) and the Court's Order setting the hearing

on January 6, 2014 (Doc. #6).

## II.    Background of the Hague Convention

31. The Hague Convention was adopted in response to a rise in international

child abductions occurring during domestic disputes.  *Abbott v. Abbott*,

560 U.S. 1, 8 (2010).  The Convention's stated purpose is "to secure the

prompt return of children wrongfully removed to or retained in any

Contracting State; and to ensure that rights of custody and of access

under the law of one Contracting State are effectively respected in the

other Contracting States." Hague Convention, Art. 1. Stated another way, "[t]he central purpose of the Convention is to prevent forum shopping in custody battles." *Valenzuela v. Michel*, 736 F.3d 1173, 1176 (9th Cir. 2013). Both Ireland and the U.S. are Contracting States to the Hague Convention.

32. Article 3 of the Hague Convention defines wrongful removal and retention, and provides:

> The removal or the retention of a child is to be considered wrongful where –
>
> > (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> >
> > (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a)* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Upon a finding of a wrongful removal or retention, the judicial or administrative agency must order the return of the child if less than a year has elapsed since the removal. *Id.*, Art. 12. If more than a year has

elapsed since the wrongful removal or retention, the court shall still order the return of the child "unless it is demonstrated that the child is now settled in its new environment." *Id.* When determining whether to return a child, the court cannot consider the merits of the underlying custody dispute. Art. 19; *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004).

33. In considering a petition under the Hague convention, the Court must answer the following four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001). The petitioner initially has the burden of proving by a preponderance of the evidence that the child has been wrongfully removed. 42 U.S.C. § 11603(e)(1). If the petitioner meets that burden, then the burden shifts to the respondent to establish an exception established by the Hague Convention. 42 U.S.C. § 11603(e)(2). If the petitioner prevails on his claim and the respondent does not establish a defense, the child must be promptly returned. 42 U.S.C. § 11601(a)(4). In addition, to help interpret the Hague Convention, courts give deference to the Explanatory Report by

Elisa Perez–Vera, the official Hague Conference reporter (the "Perez–
Vera Report") (found at

http://www.hcch.net/index_en.php?act=publications.details&pid=2779).

*Shalit v. Coppe*, 182 F.3d 1124, 1127 (9th Cir. 1999).

## III.    Wrongful Retention

34. Without considering the other elements established by *Mozes*, this Court
finds that David's claim fails because Ingrid has not retained L.S. in
violation of David's rights of custody.

35. David concedes that Ingrid did not wrongfully remove L.S. when she left
Ireland on May 25, 2012.  When determining a party's custody rights in
the child's prior habitual residence, the Court must look to that country's
law.  Hague Convention, Art. 14; *see also Whallon v. Lynn*, 230 F.3d
450, 456 (1st Cir. 2000).  In Ireland, if a child is born to unmarried
parents, only the mother is the guardian of the child.  Guardianship of
Infants Act, 1964, Part II, § 6(4) (Act No. 7/1964) (Ir.), *available at*
http://www.irishstatutebook.ie/1964/en/act/pub/0007/index.html.  The
unmarried father may petition a court to be appointed guardian and
secure custody rights. *Id*., Part II, § 11; *see also Redmond v. Redmond*,
724 F.3d 729, 732 (7th Cir. 2013).  Accordingly, if an unmarried Irish
father fails to apply for an order granting him custody prior to his child's

departure from Ireland, than that removal is not unlawful. *J. McB. v. L.E.*, [2010] IESC 48, ¶ 32 (Ir.). Since David did not apply to be named a guardian over L.S. prior to May 25, 2012, Ingrid's removal of L.S. was not wrongful.

36. David thus relies on a wrongful retention theory. David argues that while Ingrid's removal of L.S. was not wrongful, the September 11, 2012 Dublin Court orders appointing him joint guardian made Ingrid's retention of L.S. in the U.S. wrongful and in violation of Irish law. This Court is not persuaded by David's argument.

37. This is not a typical wrongful retention claim. The Perez-Vera Report states that the term "'wrongfully detained' is meant to cover those cases where the child, with the consent of the person who normally has custody, is in a place other than its place of habitual residence and is not returned by the person with whom it was staying." Perez-Vera Report, ¶ 57. The normal wrongful detention cases usually happen when one custodial parent grants the other parent permission to temporarily visit another country with their children, only to have that parent decide to not return and keep the children in the new country. *See Mozes*; *Silverman v. Silverman*, 338 F.3d 886, 890 (8th Cir. 2003); and *Baxter v. Baxter*, 423 F.3d 363, 366 (3d Cir. 2005).

38. When a party applies for custody after the other parent leaves the country, the subsequent order is referred to as a "chasing order." Courts typically do not give deference to chasing orders. *See Feder v. Evans-Feder*, 63 F.3d 217, 231 n. 3 (3d Cir. 1995) (where neither the trial or appellate court considered an order granting custody that the father obtained from an Australian court after the mother and child had left for the U.S.). "[C]ourts have repeatedly assumed rights of custody for purposes of Article 3 of the Convention means rights of custody at the time of removal." *White v. White*, 718 F.3d 300, 307 (4th Cir. 2013).

39. In *White*, a Swiss court granted a mother sole custody of the child. The mother subsequently left for the U.S. After the mother's departure, the father obtained an emergency ruling from a Swiss court prohibiting the mother from leaving Switzerland. Later, with the mother still in the U.S., a Swiss court altered the custody order and granted the father sole custody of the child. *Id*. at 302-303. In affirming the denial of the father's petition under the Hague Convention, the Fourth Circuit did not give credence to the Swiss order granting the father sole custody. *Id*. at 306. Because the Court had not previously addressed how a custody determination after removal affects a Hague Convention case, the Court looked to the how other signatories to the Hague Convention have

decided. *Id*. at 307. As it turns out, courts in other Contracting States "agree that orders claiming to adjust custody arrangements after removal or retention do not typically affect rights under Article 3 of the Convention." *Id*. (collecting decisions from Canada, England, and Scotland). Giving deference to a chasing order may produce the absurd result of allowing a country that a child has not lived in for years to "at any time modify a previous custody determination, in the absence of the child and the parent who took the child abroad, and thereby potentially justify a return remedy." *Id*. While *White* specifically dealt with a wrongful removal claim, it is clear that the logic of its holding continues into wrongful retention cases. Indeed, one case cited by *White* stated that:

> There is nothing in the Convention requiring the recognition of an ex post facto custody order of foreign jurisdictions. And there are several statements in the supplementary material to support the view that 'wrongful retention' under the Hague Convention does not contemplate a retention becoming wrongful only after the issuance of a 'chasing order.'

*Thomson v. Thomson*, [1994] 3 S.C.R. 551 (Can.)

40. In *Redmond*, a factually similar case dealing with unmarried parents in Ireland, the Seventh Circuit did not give weight to an Irish court's order granting the father joint guardianship after the mother and child had

15

moved to the U.S. 724 F.3d at 742. The Court specifically rejected the father's contention that the mother wrongfully retained the child in the U.S. after the father obtained the Irish court order naming him guardian over the child. *Id*. at 739. The Court noted that the "Hague Convention is an anti-abduction treaty; it is not a treaty on the recognition and enforcement of [foreign] decisions on custody." *Id.* (internal citations omitted). Enforcing chasing orders is beyond the Hague Convention's concept of wrongful retention. *Id*. at 740.

41. Applying those principles here, the Dublin Court's issuance of its Sept. 11, 2012 orders did not render Ingrid's retention of L.S. wrongful. It is uncontroverted that when Ingrid and L.S. left the U.S. on May 25, 2012, she did not violate David's custody rights, as none existed. When David subsequently applied for and received guardianship over L.S., this did not mean that Ingrid's retention breached David's rights of custody. Such chasing orders do not create a wrongful retention under Art. 3 of the Convention. This is because this Court must look to the custody rights existing at the time of removal. *White*, 718 F.3d at 307. Since David did not have any custody rights when Ingrid left Ireland, her retention of L.S in the U.S. is not wrongful.

## IV.   The "Settled" Defense and Equitable Tolling

42. Even assuming that Ingrid has wrongfully retained L.S., she would still prevail, as she established Art. 12's "settled" defense.

43. As discussed above, Art. 12 of the Convention provides that if the child was wrongfully removed and has resided in the new country for less than a year, the Court must return the child.  However, if more than a year has elapsed from the date of the wrongful removal or retention, the Court must order the return of the child "unless it is demonstrated that the child is now settled in its new environment."  Hague Convention, Art. 12.  The "settled" defense acknowledges that while a wrongful removal could traumatize a child, it would be just as harmful to uproot a child after he has become settled into his new environment.  *In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997).  There are two parts to the "settled" defense: (1) procedurally, more than a year must pass; and (2) substantively, the child must be "settled."

*Procedurally*

44. In just looking at the dates, it appears that the "settled" defense is available to Ingrid.  Even adopting David's proposed wrongful retention date of September 11, 2012, David did not file the Petition until December 27, 2013.  However, David argues that the time from the

wrongful retention to the filing of the Petition should be equitably tolled. The basis of this argument is the fact that he sought the return of L.S. through the Ireland Department of Justice and Equality and the U.S. Department of State, but he got hung up on bureaucratic delays.

45. Equitable tolling stays the running of Art. 12's one year timeline for the "settled" defense. *Furnes v. Reeves*, 362 F.3d 702, 723 (11th Cir. 2004). It applies when "circumstances suggest that the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return and such concealment delayed the filing of the petition for return. *Duarte v. Bardales*, 526 F.3d 563, 570 (9th Cir. 2008). Only the Fifth, Seventh, and Ninth Circuits allow equitable tolling in Hague Convention cases. *Lozano v. Alvarez*, 697 F.3d 41, 55 (2d Cir. 2012). Every other common law country refuses to apply equitable tolling. Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 73 (2012). The Supreme Court has granted *certiorari* to consider whether to allow equitable tolling in Hague Convention cases. *Lozano v. Alvarez*, 133 S. Ct. 2851 (2013). That case is fully briefed and was argued on December 11, 2013. Thus, it is very possible that the Supreme Court will soon issue

an opinion denying equitable tolling and render this entire discussion moot.

46. David seeks to expand equitable tolling beyond cases of active concealment and include situations where the petitioner actively sought the return of the child but was thwarted by bureaucratic delays. In support, David cites district court opinions from outside the Ninth Circuit. *See Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1363 (M.D. Florida 2002) and *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1313 (S.D. Florida 2004). Without considering the actual holdings of those cases, this Court will not expand equitable tolling beyond active concealment as the Ninth Circuit has refused to do so.

47. When the Ninth Circuit initially adopted equitable tolling, it stated that it applied when the abducting parent hides the child's location from the other parent. *Duarte*, 526 F.3d at 570. The Court later refused to expand *Duarte*'s limitation on equitable tolling into other circumstances. *In re B. Del C.S.B.*, 559 F.3d 999, 1014 (9th Cir. 2009). Equitable tolling only applies "where two related conditions are met: (1) the abducting parent concealed the child and (2) that concealment caused the petitioning parent's filing delay." *Id*. Equitable tolling does not apply if the petitioner knew of the child's location. *Id*. at 1015.

48. Here, David knew of L.S.' location in late July 2012. With the

exception of a three week period in February 2013 following their move

to Worden, David has known of L.S.' whereabouts. David has even had

regular contact with L.S. Since Ingrid did not take steps to actively

conceal L.S.' location after David learned of his address in Montana,

equitable tolling does not apply.

*Substantively*

49. The Court must now consider whether L.S. is "settled" here in the U.S.

Ingrid has the burden of proving this by a preponderance of the evidence.

42 U.S.C. § 11603(e)(2)(B).

50. To determine whether a child is "settled," the following factors must be

considered:

> (1) the child's age; (2) the stability and duration of the child's
> residence in the new environment; (3) whether the child attends
> school or day care consistently; (4) whether the child has
> friends and relatives in the new area; (5) the child's
> participation in community or extracurricular school activities,
> such as team sports, youth groups, or school clubs; and (6) the
> respondent's employment and financial stability.

*B. Del C.S.B.*, 559 F.3d at 1009. In addition, the child's

immigration status may only be relevant "if there is an immediate,

concrete threat of deportation." *Id*.

51. In addition, this Court may also consider the child's wishes if he has "attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13.

52. In applying the factors, this Court concludes that L.S. is settled in Montana. At eight years old, he is old enough to become settled into life in the U.S. L.S. has a stable and caring family. He and Alan have formed a loving and caring relationship. Also, L.S. has formed close and meaning full bonds with numerous members of his stepfamily. With the exception of Spring 2013, L.S. has consistently attended school and has performed well. His close friend, Valentine, lives in the area and they see each other on a regular basis. As a homemaker, Ingrid provides a stable home for L.S. Alan has provided financial stability through his employment at the Signal Peak coal mine. Finally, while L.S.' immigration status is uncertain, he is not facing the immediate threat of deportation.

53. Additionally, L.S. has obtained the level of maturity where this Court can consider his viewpoints. L.S. clearly told this Court that he wants to stay in Montana. L.S. would like to maintain a relationship with David, but he does not want to be returned to Ireland. L.S. has expressed a

desire to someday visit David in Ireland. This can be worked out among the parties or through a court of competent jurisdiction.

54. In sum, L.S. is settled here in Montana. Therefore, Ingrid has successfully invoked Art. 12's "settled" defense.

## ORDER

Therefore, it is hereby ordered that:

1.  David's request for the return of L.S. is **DENIED**;

2.  Any appropriate custody determination, if necessary, shall be made by a court of competent jurisdiction in the United States;

3.  Until such time as a court of competent jurisdiction in the United States enters a formal adjudication of custody, David shall not remove L.S. from Yellowstone County; and

4.  David shall surrender to Ingrid any passport or other travel documents he has obtained with regard to L.S.

It is further ordered that Ingrid's Motion to Dismiss is **DENIED AS MOOT**, as she prevailed on the merits.

DATED this 24th day of January 2014.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge